# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT ASHLAND

CIVIL ACTION NO. 03-204-DLB

GERALD GRESH                                                              PLAINTIFF

v.                              **MEMORANDUM OPINION AND ORDER**

WASTE SERVICES OF AMERICA, INC.
W. TODD SKAGGS, JAMES P. DALTON                          DEFENDANTS

* * * * *

Plaintiff Gerald Gresh commenced this civil action against Defendants, Waste Services of America, Inc. (WSA), W. Todd Skaggs, James P. Dalton and River Cities Disposal, LLC (RCD), alleging that he was fraudulently induced to refrain from exercising his stock option until after most of WSA's assets had been sold or transferred. Gresh asserted various state law claims, including fraudulent misrepresentation and breach of the implied duty of good faith and fair dealing.

This matter is on remand from the Sixth Circuit Court of Appeals for the second time. *Gresh v. Waste Servs. of Am.*, 311 F. App'x 766 (6th Cir. 2009). Presently before the Court is Defendants Waste Services of America (WSA), Todd Skaggs, and James Dalton's Motion in Limine (Doc. # 122) and Motion to Exclude Expert Testimony of Calvin Cranfill (Doc. # 130). The Court convened a final pretrial conference on August 31, 2010, at which both pending motions were addressed. Robert Houlihan, Jr. appeared on behalf of Plaintiff, and Gregory Haynes and Michelle Wyrick appeared on behalf of Defendants. The matter is now ripe for review. For the reasons set forth below, both Defendants' motion in limine

and motion to exclude the expert testimony of Calvin Cranfill are **granted in part and denied and part**.

## I. BACKGROUND

The Court of Appeals summarized the relevant facts of this case in its most recent decision. *See Gresh*, 311 F. App'x at 769-70. Accordingly, a full recitation of the factual history is unnecessary. It is appropriate, however, to note the current procedural posture and highlight facts relevant to the issues that remain on remand.

In its February 17, 2009 decision, the Court of Appeals affirmed in part and reversed in part this Court's prior grant of summary judgment, finding that factual issues precluded summary judgment on the breach of the implied duty of good faith and fair dealing claim and one fraudulent misrepresentation claim. *Id.* at 774, 776. The fact at issue for both remaining claims is Defendant James Dalton's statement to Gresh that "nothing...had crossed [his] desk" concerning the sale of WSA in response to Gresh's inquiry about the imminence of Defendant Todd Skaggs' plan to sell WSA. Specifically, the Sixth Circuit held that a "jury reasonably could conclude the representation was fraudulent" and further could reasonably conclude that a breach of the implied duty of good faith and fair dealing occurred when Dalton made the statement. *Id.*

After the case was remanded, Defendants again submitted a motion for summary judgment, this time seeking dismissal of Defendant Todd Skaggs and Defendant River Cities Disposal, LLC from the case, arguing that neither Skaggs nor RCD could be held vicariously liable for Dalton's alleged misrepresentation. This Court granted the motion as to Defendant RCD on both claims and granted the motion as to Defendant Skaggs only on the breach of implied duty of good faith and fair dealing claim. The Court denied the motion

as to Skaggs on the fraudulent misrepresentation claim concluding that a genuine issue of material fact remained as to whether Dalton was acting on behalf of Skaggs individually, rather than as a mere agent of WSA, when he made the alleged fraudulent misrepresentation. With trial fast approaching on September 13, 2010, Defendants filed both a motion in limine and motion to exclude Plaintiff's expert.

## II. ANALYSIS

### A. Motion in Limine

#### 1. Standard

Federal district courts have the power to exclude evidence in limine pursuant to their inherent authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing Fed. R. Evid. 103(c)). The Court has the power to exclude evidence in limine "only when evidence is clearly inadmissible on all potential grounds." *Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 810 (N.D. Ohio 2002) (citing *Luce*, 469 U.S. at 41 n.4). Unless the evidence meets this high standard, "rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). Denial of a motion in limine does not guarantee that the evidence will be admitted at trial, and the court will hear objections to such evidence as they arise at trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989) (citing *Luce*, 469 U.S. at 41). The district judge, moreover, has sound discretion to alter or amend a previous in limine ruling at trial. *Luce*, 469 U.S. at 41-42.

#### 2. Defendants' Motion in Limine

Defendants Todd Skaggs, James Dalton, and WSA seek to exclude three broad

categories of evidence, one specific document and a statement made by Defendant Dalton in December 1998. (Doc. # 122). Specifically, Defendants seek to exclude: (1) evidence that contradicts Gresh's stock-option agreement with WSA; (2) evidence related to the June 1998 non-binding letter of intent between Liberty, WSA, and Skaggs; (3) evidence that Dalton told Gresh in December, 1998, that Skaggs "wanted to wait" before negotiating further on the stock-option buyout; (4) evidence related to damages flowing from the valuation of the Big Run and Georgetown landfills; and (5) evidence related to Gresh's purely speculative damages.

### (a)  Evidence that contradicts the stock-option agreement

In their motion, Defendants argue that any evidence contradicting the stock-option agreement should be excluded because it: (1) violates the parol evidence rule; and (2) violates the Sixth Circuit's February 17, 2009 decision. Plaintiff contends that Defendants' motion as it relates to such evidence is inappropriately vague. The Court agrees with Plaintiff on this issue.

Defendants target two categories of evidence in their motion to exclude evidence contradicting the stock-option agreement: (1) evidence suggesting that Gresh's damages include 5% of the Big Run and Georgetown landfills; and (2) evidence suggesting that Gresh was more than an at-will employee and option holder of WSA stock. The admissibility of the former is discussed more fully in Section II, A, 2, (d), *infra*. As to the latter, the motion is denied as inappropriately vague, but the Court's denial does not bear on its ability to exclude specific testimony or evidence presented at trial that violates the parol evidence rule.

As an initial matter, Defendants' argument that evidence contradicting the stock-option agreement should be excluded because it violates the Sixth Circuit's prior decision is groundless. "A district court is simply not bound by a denial of summary judgment, whether it be its own or [the Circuit Court of Appeals]" in its determination of evidentiary issues presented for trial. *Regal Cinemas, Inc. v. W & M Props.*, 90 F. App'x 824, 829 (6th Cir. 2004) (district court was not bound by the earlier decision of the Sixth Circuit reversing grant of summary judgment to defendants when ruling on a Rule 50 motion at trial). Never mind that the standard applied in adjudicating a motion for summary judgment is more exacting than that of a motion in limine, the two are decided at different stages of litigation for markedly different purposes. Although the Sixth Circuit's prior decision certainly informs the issue of relevancy relative to the evidence presented before the district court, the Court is not required to–nor will it–interpret the Sixth Circuit's decision as barring all evidence referred to in analyzing dismissed claims ultimately affirmed on appeal.

Defendants seek to exclude evidence that Plaintiff was anything but an at-will employee of WSA. (Doc. #122, at 8). Defendants appear to garner their argument from the Sixth Circuit's refusal to rely on Gresh and Skaggs' alleged oral agreement, made prior to the stock-option agreement's signing, that the two were "essentially partners, or co-owners" because it violates the parol evidence rule. *Gresh*, 311 F. App'x at 771 (citing Addington's affidavit wherein he asserts that Skaggs and Gresh orally agreed that the two were essentially partners) ("[W]hatever oral arrangements the parties may have had, the parol-evidence rule prohibits Gresh from using (and bars us from considering) Addington's affidavit to establish the existence of a 'broader, oral agreement' that overrides the terms of the stock-option agreement." (citation omitted)).

Evidence of an oral agreement made prior to the stock-option agreement that Gresh was a partner is—without question—inadmissible pursuant to the parol evidence rule. Defendants' motion broadly seeks to exclude *any* evidence that Gresh "was anything other than an at-will employee." (Doc. # 122, at 8). At this juncture, the Court is unwilling, to grant Defendants' motion thereby excluding broad categories of evidence not yet sought to be admitted. Admissibility, then, is best determined during trial on a case-by-case basis at the time specific testimony or a particular document is introduced. Accordingly, Defendants' motion is **denied** as inappropriately vague. However, the Court will entertain proper objections raised during trial.

**(b)    Evidence related to the June 1998 non-binding letter of intent between Liberty, WSA & Skaggs**

Defendants argue that the June 1998 non-binding letter of intent between Liberty, WSA, and Skaggs should be excluded on relevancy grounds and its potential to mislead the jury. Specifically, Defendants argue the letter cannot relate to Gresh's claim that he would have exercised his option but for the fact that Dalton told him in October 1998 that nothing had crossed his desk. Defendants dispute, moreover, any attempted use of the letter to establish that WSA's assets were worth $29 million at the time the non-binding letter was executed, arguing the terms of the deal between Liberty and WSA changed substantially between the time the non-binding letter was signed in June and the time the binding letter of intent was signed on October 6, 1998. Such use, Defendants argue, would unfairly mislead the jury. The Court finds Defendants' contention unpersuasive.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence." Fed. R. Evid. 401. Evidence which is not relevant is inadmissible at trial. Fed. R. Evid. 402. The Sixth Circuit has adopted an "extremely liberal" standard for relevancy. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). "[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth." *United States v. Whittington*, 455 F.3d 736, 738-39 (6th Cir. 2006) (quoting *DSX, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996)).

In its February 17, 2009 decision, the Sixth Circuit highlighted the relevancy of the non-binding letter relative to Gresh's fraudulent misrepresentation claim when it explained "[h]aving negotiated with Liberty for nearly four months, Skaggs could not represent truthfully to Gresh in early October 1998 that there were no plans to sell the corporation. And Dalton, the treasurer and vice president of WSA, cannot show that he had no knowledge of Skaggs' plans to sell most of WSA's assets to Liberty." *Gresh*, 311 F. App'x at 774. Clearly, the letter is relevant insofar as it tends to establish that Dalton knew his October representation to Gresh was false. Dalton's position as WSA's treasurer and vice president makes it highly implausible that he was ignorant of WSA's negotiations to sell to Liberty during the four months prior to his representation to Gresh in October 1998 that nothing had crossed his desk.

Defendants' argument that introduction of the non-binding letter will mislead the jury further lacks merit sufficient to warrant exclusion. Defendants seem concerned that a jury might learn the WSA/Liberty deal was a $29 million deal at the time the non-binding letter of intent was signed, seemingly arguing such information will mislead the jury on the issue of damages. (Doc. # 129, at 11). Despite Defendants' argument, the Court is not satisfied

that the probative value of the non-binding letter is "*substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403 (emphasis added). Although the WSA/Liberty deal changed from the time the non-binding letter was signed in June, 1998, to the time the binding letter was signed in October, 1998, the fact remains that WSA sold substantially all of its assets to Liberty after four previous months of negotiation: a fact relevant to the exercise of Gresh's stock option. Moreover, the letter is highly probative in establishing the likelihood, or lack thereof, that Dalton was completely ignorant in October 1998 of the pending negotiations to promptly sell WSA. Accordingly, Defendants' motion to exclude the 1998 non-binding letter of intent is hereby **denied**.

### (c) Evidence that Dalton told Gresh that Skaggs "wanted to wait" before negotiating further on the stock-option buyout

Defendants contend any evidence that in December 1998 Dalton told Gresh that Skaggs "wanted to wait" before further negotiating the stock-option buyout should be excluded on the basis that it is irrelevant and potentially prejudicial. Defendants specifically argue irrelevancy on the basis that the Sixth Circuit concluded in its prior decision that the statement could not be the basis of a fraud claim because it was actually true. Defendants' argument lacks merit.

The Sixth Circuit's affirmance of the district court's grant of summary judgment on Plaintiff's fraud claim relative to Dalton's representation that Skaggs "wanted to wait" to negotiate any potential buyout of Gresh's stock-option agreement does not compel the exclusion of the statement at trial. Defendants' attempt to broadly appropriate the Sixth Circuit's affirmance to evidentiary issues presented before the district court for trial on

8

entirely separate legal claims is untenable. That Dalton's statement was insufficient to support a prima facie fraud claim–because the statement was, in fact, true–is immaterial to whether the statement is relevant to prove Plaintiff's fraudulent misrepresentation and breach of duty claims based on Dalton's representation that nothing had crossed his desk concerning the sale of WSA in October 1998.

The statement that Skaggs "wanted to wait" is relevant in the instant action because the statement tends to establish that Skaggs and Dalton's intent all along was to prolong stock-option negotiations with Gresh until the Liberty sale was complete and thereby sheds some light on the veracity, or lack thereof, of Dalton's October 1998 statement, which Plaintiff contends induced him to refrain from exercising his stock option. It is also relevant to establish the reasonableness of Plaintiff's reliance. Defendants' argument, moreover, that the statement will unfairly prejudice or mislead the jury lacks merit. The existence of a properly instructed jury will eradicate, in the Court's view, the possibility of unfair prejudice stemming from any admission of the December statement. In light of the statement's relevancy to Gresh's remaining fraud claim, Defendants' motion to exclude the statement that Skaggs "wanted to wait" before negotiating further is **denied**.

**(d)    Evidence related to damages flowing from the valuation of Big Run and Georgetown landfills**

Defendants seek to exclude evidence of Plaintiff's alleged interest in the Big Run and Georgetown landfills, arguing that damages evidence relative to both landfills is irrelevant because WSA never owned any interest in either. (Doc. #122, at 10). Defendants argue that Georgetown has always been owned by Waste Services of the Bluegrass ("WSB")–one of WSA's affiliated companies–and further that WSA does not own

9

any of WSB's stock, which is owned entirely by Todd Skaggs.  Accordingly, Defendants contend that even if Gresh exercised his option to purchase in October 1998, he would not have obtained any interest in Georgetown.

Plaintiff asserts that Georgetown's value should be calculated in determining Gresh's damages because: (1) Skaggs represented WSB publicly as a "sister company"; (2) Skaggs presented a proposal to the City of Georgetown in November 1997 that WSB was a company with "vast experience," touting Gresh's resume and referring to Gresh as Vice President; (3) WSA provided the financial underpinning for Georgetown's development; and (4) in attempting to buyout Gresh's option Skaggs' proposed Agreement & Release required Gresh to "waive any claim as to affiliated companies." (Doc. #126, at 7).  Plaintiff's expert concluded that the "intercompany transactions between [WSA, RCD, and WSB] render the companies virtually indistinguishable from one another."  (Doc. #126, Ex. 6 at 3-4).

Most fundamentally, Defendants object to the admissibility of the above- referenced evidence on the basis of relevancy.  To determine relevancy, it is helpful to reiterate the elements of the remaining claims Plaintiff must prove at trial.  First, to recover for fraudulent misrepresentation, the Plaintiff must establish by clear and convincing evidence that, in taking or refraining from taking an action, he reasonably relied on a representation that was material, false, and known to be false or made recklessly.  *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993); *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. Ct. App. 1978).  The Plaintiff must further establish the representation was made with the intent of inducing him to act or refrain from acting, thereby causing injury.  *Coffey*, 992 F.2d at 1447; *Wahba*, 573 S.W.2d at 359.

10

A plaintiff is entitled to damages based on inaction "when an untrue statement is made with the intent to induce that person to refrain from acting so long as it can be demonstrated that the false statement produced the inaction." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999). In an action for fraud, it is unnecessary to prove the *amount* of damages with certainty; only the *existence* of damages need be proved with certainty. *Id.* Once existence is determined, the jury need only determine the fair and reasonable estimate of the particular injury. *Id.* The measure of compensatory damages for fraud, then, is actual pecuniary loss sustained. *Sanford Constr. Co. v. S&H Contractors, Inc.*, 443 S.W.2d 227, 239 (Ky. 1969). Such damages further include all pecuniary loss flowing from the fraud. *Sanders v. Chesmotel Lodge, Inc.*, 300 S.W.2d 239, 241 (Ky. 1957). Additionally, when established by clear and convincing evidence, a jury may rightly award punitive damages in a fraud action. K.R.S. § 411.184.

Second, under Kentucky law, parties have a duty in carrying out a contract to act in good faith, sincerely and without deceit or fraud. *Pearman v. W. Point Nat'l Bank*, 887 S.W.2d 366, 368 n.3 (Ky. Ct. App. 1994). This is generally observed as the covenant of good faith and fair dealing implied in every contract. *Rainer v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). A breach of the implied duty of good faith and fair dealing is an impossibility where a contract has not yet been formed. *Quadrille Bus. Sys. v. Ky. Cattlemen's Assoc., Inc.*, 242 S.W.3d 359, 364 (Ky. Ct. App. 2007). "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971) (quoting *Gulf, Mobile & Ohio R.R. Co. v. Ill. Cent. R.R. Co.*, 128 F. Supp. 311, 324 (N.D. Ala. 1954)).

Accordingly, Plaintiff will certainly have to introduce evidence relevant to his damages. Despite the interconnectedness of WSA and its affiliates, however, Plaintiff presents no tenable legal theory that would permit evidence relative to the Georgetown Landfill: an asset wholly owned by a company not party to the stock-option agreement. Plaintiff's stock-option agreement gave him an interest in WSA's common stock, and if purchased would make Gresh a 5% shareholder in WSA. Assets owned by WSB, and the profits flowing therefrom, are irrelevant on the issue of damages relative to Gresh and Skaggs' agreement pursuant to the WSA stock option. WSA never owned an actual interest in the Georgetown Landfill even if it financially backed Georgetown's development. Defendants' motion in limine to exclude evidence relative to Georgetown Landfill is therefore **granted**.

Next, Defendants ask this Court to exclude any evidence related to the Big Run Landfill. The Big Run Landfill is currently owned by RCD, however, Plaintiff claims that Big Run was originally owned by WSA and then fraudulently transferred to RCD in September 1998. In 1996 and 1997, WSA obtained the option to purchase and a 25-year lease on the real estate for the Big Run Landfill. In August 1997, the Boyd County Fiscal Court held a public meeting and gave local approval to WSA for the Big Run Landfill. From September 1997 through April 1998, WSA submitted the required formal applications with the Kentucky Division of Waste Management to allow WSA to build and operate Big Run Landfill. (Doc. #131, at 18).

In mid-September 1998, during WSA's negotiations with Gresh, Skaggs formed RCD, which did not–at that time–have its own bank account or any assets. Big Run was carried on WSA's books as "development costs" in an amount just over $700,000.00 until

12

1999, according to Plaintiffs. Defendants claim that Big Run was transferred to RCD in September 1998. That said, RCD did not pay consideration for the transfer until January 1999. Therefore, WSA did not realize its profit from the transfer of Big Run until after Dalton made the alleged misrepresentation in October 1998. The book value of Big Run Landfill in the critical months of 1998 was $706,512.00, 5% of which equals $35,325.00. (Doc. #131, at 7).

However, the profit realized from the transfer of Big Run was never distributed in the form of a dividend or shareholder distribution such that Gresh would have been entitled to a 5% share of the proceeds. As a minority shareholder, Gresh would not have the power to determine when a corporate asset should be sold and whether any profit therefrom should be distributed. Issuance of shareholder distributions are left to the discretion of the corporation's Board of Directors consistent with statutory restrictions limiting distributions if the corporation would not be able to pay its debts as they become due or in the event the corporation's total assets were less than the sum total of its liabilities. K.R.S. § 271B.6-400.

At oral argument, Plaintiff's counsel asserted Gresh's right to the proceeds from Big Run on the basis that Skaggs used his shareholder distribution to pay RCD's outstanding debt to WSA for the transfer of Big Run. Counsel's contention, however, fails to explain why Gresh would be entitled to 5% of WSA's realized profits from Big Run in the absence of any shareholder distribution issued for that transaction. Plaintiff further argues for the admissibility of evidence relative to an option to purchase a 50% interest in Big Run for $6.3 million in 2003, and Big Run's final sale price of more than $30 million to its present owner in 2005. That an option to purchase was sold for $6.3 million and that Big Run was later

sold by RCD for $30 million is completely irrelevant to Gresh's potential shareholder interest in WSA because WSA never benefitted from either transaction. Accordingly, evidence that Big Run Landfill was worth $706,512.00 in October 1998, and RCD's subsequent acquisition and sale of the asset is irrelevant. Defendants' motion in limine is therefore **granted** with respect to evidence of Big Run landfill.

### (e)    Evidence related to Gresh's purely speculative damages

Defendants' motion to exclude evidence related to Gresh's purely speculative damages seeks to exclude the same evidence sought to be excluded via Defendants' *Daubert* motion. Accordingly, this category of evidence is substantively analyzed in Section II, B, *infra.* Defendants ask the Court to exclude expert Calvin Cranfill's reports purporting that Gresh is entitled to damages in excess of half of million dollars, not including potential damages claimed for the Georgetown and Big Run landfills. Specifically, Defendants argue that Gresh's claimed damages are speculative because a minority stockholder is not ordinarily entitled to a proportionate value of the company's stock, and Cranfill's calculations using an 8% prejudgment interest are incorrect because prejudgment interest is not recoverable for fraud and breach of good faith and fair dealing claims.

### B.    Defendants' Motion to Exclude Calvin Cranfill

### 1.    Standard

Under Federal Rule of Evidence 702, a qualified expert with specialized knowledge may give his opinion if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. This rule, amended in 2000, reflects the Supreme Court's rule in *Daubert v. Merrell Dow Pharm., Inc.*,

509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Under these precedents, a proposed expert's opinion is admissible if (1) the witness is qualified by knowledge, skill, experience, training or education; (2) the testimony of that expert witness is relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony of that expert witness is reliable, meaning the reasoning and methodology can properly be applied to the facts in issue. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

The Sixth Circuit Court of Appeals recently explained that "*Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009). The Rule 702 inquiry is a flexible one, and the Court's focus "must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 177 (quoting *Daubert*, 509 U.S. at 594-95). And, the Court must be sure not "to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. Consequently, "rejection of expert testimony is the exception, rather than the rule." *Id.* at 530.

## 2. Defendants' Motion to Exclude

Defendants seek to exclude the testimony of Plaintiff's expert Calvin Cranfill, a certified public accountant with an accreditation in business valuation. Defendants broadly argue that Cranfill's testimony and damage calculations do not relate to WSA's stock, and thus, his testimony is neither relevant nor reliable and should be excluded pursuant to Rule 702 and 703 of the Federal Rules of Evidence. Defendants challenge the relevance of

Cranfill's calculations in evaluating Gresh's damage entitlement. According to Defendants, Cranfill has produced seven reports, none of which address any issues of liability. (Doc. #130, at 5).[1]

The first three reports conclude that Gresh's 5% stock option would have been worth approximately $600,000 if exercised at the time the proceeds from the Liberty sale were distributed. (Doc. #130, at 5). The latter four reports purport amounts due to Gresh based on his interest in affiliated companies, including interest through September 13, 2010. (Doc. #130, at 5). Cranfill concludes that Gresh is also entitled to a 5% interest in WSA's affiliated companies, including RCD. Specifically, Defendants argue Cranfill's testimony is inadmissible on the following grounds: (1) Cranfill failed to value Gresh's interest in *WSA*; (2) Cranfill's damage computations relating to RCD are irrelevant; (3) testimony related to distributions from the Liberty sale are irrelevant; and (4) Cranfill's interest calculations are not based on principled reasoning as prejudgment interest is not appropriate in the instant action.

### (a)    Cranfill's testimony concerning distributions from the Liberty sale is relevant

Defendants unconvincingly argue that Gresh would not have been entitled to a proportionate share of WSA's distributed profits and earnings as a minority shareholder. Defendants contend Gresh's interest pursuant to the stock-option agreement was one only for the market price of fifty (50) shares of stock on the date Gresh was prevented from exercising it. (Doc. # 130, at 8). In making this argument, Defendants rely upon a Third

---

[1]Plaintiff contends that Cranfill only produced, in substance, four reports. (Doc. # 131, at 6-7). Regardless of the number of reports produced, or how divided, the information is the same. The Court will therefore not concern itself with excluding or admitting information contained in specific reports, but rather will focus on the category in which exclusion is sought.

Circuit decision wherein the court affirmed the district court's calculation of damages for improper denial of the right to exercise a stock option as the difference between the exercise price and the market price of the stock on the date plaintiff was prevented from exercising it. *Scully v. US WATS, Inc.*, 238 F.3d 497, 508 (3d Cir. 2001). *Scully*, however, is wholly distinguishable from the instant action in two significant respects: (1) Gresh's claim is not one for improper denial of the right to exercise a stock option, in fact, Defendants dispute that they prevented Gresh from exercising his option; and, more importantly, (2) the company that improperly denied exercise of the plaintiff's option in *Scully* was not a closely held corporation, but one whose stock was publicly traded on the open-market. *Id.* Publicly traded stock is capable of fair market valuation, which ostensibly fluctuates based on market investments. The stock of a closely held corporation, however, is not openly bought and sold, and any valuation attempt based on fair market value of the stock is inappropriate. *See Shawnee Telecom Res., Inc. v. Brown*, Nos. 2008-CA-000042-MR, 2008-CA-000167-MR, 2009 WL 2475269, at *3 (Ky. Ct. App. 2009) (unpublished).

Shareholders of a corporation, by definition, own a proportionate interest in the business. As an owner, a shareholder possesses a proprietary interest in the corporation evidenced by the respective shares owned. A rule of law disallowing proportionate interest valuation not otherwise established in the Articles of Incorporation is untenable. "[T]o fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders." *Shawnee*,

2009 WL 2475269, at *3 (quoting *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1141 (Del. 1989)).[2]

Defendants cite *Goldstein v. Goldstein*, 377 S.W.2d 52 (Ky. 1964), for the proposition that a minority share of stock is not ordinarily entitled to proportionate value. (Doc. # 129, at 11). *Goldstein*, however, is inapposite to the instant action. *Goldstein* involved the property rights of a husband and wife after dissolution of their marriage. During their marriage, plaintiff and defendant opened a successful retail drug store. Initial capitalization was largely supplied by the husband, but both equally shared in the managerial duties of the business. Husband and wife were later issued equal shares of stock in the company. For purposes of distributing property after the couple's divorce, the trial court valued the wife's interest as a 15% shareholder of the company's stock. Notwithstanding the Kentucky high court's opinion that the trial court underestimated the wife's interest in the company, the high court evaluated the overall equity of the property division and reversed, finding that the wife should have been paid a monetary amount for her interest in the company rather than retain her stock interest because "whether [a minority share of capital stock] bears dividends is largely subject to the will of the controlling party." *Id.* at 56.

---

[2]*See also* K.R.S. § 271B.6-010 Authorized Shares:

(1) ....All shares of a class shall have preferences, limitations, and relative rights identical with those of other shares of the same class except to the extent otherwise permitted by K.R.S. § 271B.6-020.

WSA's articles of incorporation indicate that only one class of stock was issue thereby permitting the conclusion that all shareholders would be entitled to identical rights, including identical distributions based on percentage of ownership as K.R.S. § 271B.6-020 is inapplicable to the facts of this case.

Unlike the facts at issue in *Goldstein*, a shareholder's distribution was made here. That Gresh's interest was subject to the willingness of the controlling shareholder to distribute funds is not in issue. Skaggs did in fact make large shareholder distributions to himself as sole shareholder of WSA after the Liberty sale was complete. Moreover, the issue before the court in *Goldstein* was the overall equity of the former couple's marital property. The Court was taking account of a host of other property interests relative to the Goldstein's marital property to make its determination about the appropriate interest to grant the wife in the retail drug store. Property division of a marital estate is not sufficiently analogous to warrant the inference Defendants advocate. Because a shareholder distribution was made in this case, it is fair and reasonable to assume that had Gresh been a 5% shareholder of WSA he would rightly be entitled to a proportionate share of the Liberty sale.

Defendants in their *Daubert* motion, and again at oral argument, argue that because Cranfill failed to use one of many accepted methods of business valuation in calculating Plaintiff's alleged interest in WSA, his testimony should be excluded. Specifically, Defendants argue that Cranfill should have used either the net assets approach, the income approach, or the market approach in valuing Gresh's potential 5% interest in WSA. (Doc. # 130, at 9). The market assets approach to valuation would be inappropriate given that WSA is a closely held corporation, and the approach is dependent upon concepts of open-markets and stock that is publicly sold on the open-market. Moreover, that Gresh's interest could have been valued in ways other than a mere computation of his proportionate share of Skaggs' shareholder distribution does not detract from the appropriateness of Cranfill's testimony. Because Skaggs–as controlling shareholder–opted to make a

shareholder distribution, if Gresh had been a 5% owner of WSA he would have been entitled to a 5% share of the Liberty sale proceeds distributed. Cranfill's purported testimony, as a CPA then, is (1) based on sufficient facts from financial data relative to WSA, (2) is the result of reliable principles and methods–even if not the preferred method of Defendants, and (3) Cranfill properly performed the computations for a 5% interest in shareholder distributions to the facts of this case. Fed. R. Evid. 702. Accordingly, his testimony regarding the shareholder distributions from the Liberty sale is relevant and admissible.

Defendants also argue that Gresh is entitled only to contract remedies based on his breach of contract claim and actual pecuniary loss based on his fraud claim. (Doc. #130, at 8). Defendants are incorrect. The measure of *compensatory* damages in an action for fraud is actual pecuniary loss sustained. *Sanford*, 443 S.W.2d at 239. And, Kentucky law has made clear that such damages include all pecuniary loss flowing from the fraud. *Sanders*, 300 S.W.2d at 241. Moreover, punitive damage awards may be assessed when fraud is established by clear and convincing evidence. In assessing punitive damages, the profitability of the misconduct is one of the factors to be considered by the jury. K.R.S. § 411.186(2)(c). Here, after the sale of the Decatur Landfill–WSA's most valuable asset–Defendant Skaggs, as a corporate director, made a shareholder distribution to himself as sole shareholder in an amount exceeding $12 million. (Doc. # 131, Ex. 15). Bearing this in mind, the profitability of the Dalton's alleged misrepresentation becomes clear: had Gresh exercised his option in October 1998, he would have rightly been entitled to 5% of the shareholder distribution made in January 1999.

Accordingly, testimony of the Liberty sale distribution is relevant for the purpose of assessing damages in this case. Defendants' motion to exclude Cranfill's testimony is **denied** insofar as it seeks to exclude testimony relative to his calculations of Gresh's 5% interest in the Liberty sale. However, if Gresh is successful at trial, any damage award rendered will be reduced by $50,000 to reflect the price Gresh would have paid had he exercised the option. *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 729 (7th Cir. 1994) (affirmed the jury verdict in favor of plaintiff, but reduced the amount of damages awarded to reflect the price plaintiff would have paid had he exercised his stock option).

### (b)   The propriety of prejudgment interest is an issue for the Court to decide as a matter of law

Cranfill calculated interest on a 5% share of the Liberty distributions to Defendant Skaggs from January 31, 1999 and interest on a 5% interest in the value of Big Run landfill calculated from December 31, 1998. In calculating interest, Cranfill used both a mixed portfolio rate based on the annually published Valuation Yearbook and Kentucky's statutory prejudgment interest rate. K.R.S. § 360.010(1). Relying on Illinois law, Defendants argue that Gresh is not entitled to prejudgment interest on his claims of fraud and breach of the implied duty of good faith and fair dealing. (Doc. # 122, at 14). Defendants cite *Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank*, 602 F. Supp. 2d 928 (N.D. Ill. 2009), for the proposition that prejudgment interest is not recoverable for fraud and breach of implied duty claims in Illinois, arguing Gresh is therefore not entitled to prejudgment interest. (Doc. # 122, at 14). Plaintiff cites Kentucky law to argue prejudgment interest is warranted in this case because his damage entitlement is liquidated. The Court, however, disagrees with Plaintiff's assessment. Gresh's damage entitlement is

not readily quantifiable, and therefore, is unliquidated for the purpose of evaluating the propriety of prejudgment interest.

When a federal court's jurisdiction rests upon diversity, the assessment of prejudgment interest is governed by state law. *Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 270 (6th Cir. 1985). Prejudgment interest under Kentucky law is awarded as a matter of right only when damages are liquidated. *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991). On an unliquidated demand, prejudgment interest is a matter within the sound discretion of the trial court and may be allowed as justice so requires; it is not an issue of fact to be decided by the jury.[3] *Id.* The Court's duty is to balance the undisputed facts and equities and decided whether prejudgment interest is appropriate.[4]

To determine whether "a claim is liquidated or unliquidated, one must look to the nature of the underlying *claim*, not the final award." *3D Enters. Contracting Corp. v. Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005). Although unclear at times, an amount is characterized as liquidated if it is "[m]ade certain or fixed by agreement of parties or by operation of law. Common examples are a bill or note past due, an amount due on an open account, or an unpaid fixed contract price" whereas

---

[3]In a recent case, the Kentucky Supreme Court–in *dicta*–cited *Nucor* for the proposition that "prejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court *or jury* on unliquidated demands." *3D Enters. Contracting Corp. v. Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005) (emphasis added). Because the issue of whether prejudgment interest on an unliquidated demand can be decided by the Court *or* jury was not specifically before the Kentucky Supreme Court in that case, this Court relies on the well-established holding in *Nucor* that prejudgment interest for unliquidated claims is a matter within discretion of the trial court, not an issue of fact for the jury.

[4] If the damage amount is unliquidated, justice may not require the payment of prejudgment interest, particularly if the injured person has discouraged settlement by making exorbitant demands or has delayed in filing suit. *Nucor*, 812 S.W.2d at 144. Another factor the Court will consider is the length of time a party has been deprived of the use of the funds at issue.

unliquidated damages are those "which have not been determined or calculated,...not yet reduced to a certainty in respect to amount." *Nucor*, 812 S.W.2d at 141 (citations omitted).

Plaintiff contends his claim for damages is liquidated because had Gresh exercised his option as a shareholder he would have been entitled to 5% of the distribution following the Liberty sale: an amount "capable of ascertainment by mere computation." *3D Enters.*, 174 S.W.3d at 450. While true that 5% of the approximate $12 million in profits garnered from the sale of WSA's assets is an amount that can be easily calculated, Plaintiff's argument misapplies the distinction between liquidated and unliquidated damage amounts.

The nature of Gresh's claim is that of a 5% shareholder in WSA; the value of which is not fixed, but rather dependent upon WSA's corporate status and financial well-being. That WSA's assets were later sold and subsequent distributions were made to the company's sole shareholder in an amount exceeding $12 million–an amount readily ascertainable–is immaterial. *Id.* Gresh's interest under the stock-option agreement was one for a percentage of ownership of the company's common stock, which would allow Gresh a proportionate share of profits earned once distributed. His potential interest in the company was one that, at the time agreed upon, could not be reduced to fixed amount capable of mere computation. Accordingly, this Court finds that Gresh's damage entitlement is properly characterized as an unliquidated demand such that this Court has discretion in whether to award prejudgment interest; a determination the Court will render post-verdict if necessary. Defendants' motion, therefore, is **granted** relative to Cranfill's testimony regarding prejudgment interest.

### (c) Cranfill's testimony regarding any valuation of RCD is irrelevant

Cranfill computed the gain Skaggs realized from the sale of his assumed 50% interst in RCD as reported on the limited tax return information for 2005, 2007, and 2008, at Plaintiff's request. From that calculation, Cranfill further computed a 5% interest in Skaggs' total gain from the sale of his interest in RCD that equals in excess of $1.7 million. Cranfill's calculations relative to RCD, however, are completely irrelevant to Gresh's overall damage entitlement based on his stock-option agreement to purchase a 5% interest in WSA. Accordingly, Defendants' motion to exclude Cranfill's testimony insofar as it concerns Skaggs gain from the sale of his interest in RCD is **granted**.

### III. CONCLUSION

For the reasons stated herein, **IT IS ORDERED** as follows:

1.  Defendants' Motion in Limine (Doc. # 122) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.  Defendants' motion in limine is hereby **GRANTED** insofar as evidence relative to the Georgetown and Big Run landfills' ownership and value is irrelevant to Gresh's overall damage entitlement;

    b.  Defendants' motion in limine is hereby **DENIED** insofar as evidence contradicting the stock-option agreement is inappropriately vague and will be considered on a case-by-case basis if and when presented at trial, the 1998 non-binding letter of intent is relevant and admissible, and Dalton's statement that Skaggs "wanted to wait" to negotiate is relevant and admissible.

2.   Defendants' Motion to Exclude Expert Testimony of Calvin Cranfill (Doc. # 130) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

   a.   Defendants' motion to exclude is hereby **GRANTED** insofar as Cranfill will not be permitted to testify on matters concerning prejudgment interest, Skaggs 50% assumed interest in RCD and Gresh's alleged 5% interest flowing therefrom, and Big Run's value and any later profits earned from its sale.

   b.   Defendants' motion to exclude is hereby **DENIED** insofar as Cranfill shall be permitted to testify concerning the value of a 5% interest in the Liberty distribution made to Skaggs in January 1999.

This 1st day of September, 2010.



Signed By:
*David L. Bunning*
United States District Judge